## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN DOE, | Case No. |
| Plaintiff, | |
| | **VERIFIED COMPLAINT** |
| v. | |
| | Jury Trial Demanded |
| MGH INSTITUTE OF HEALTH PROFESSIONS, | |
| Defendant. | |

Plaintiff John Doe ("Plaintiff"), for his complaint against the MGH Institute of Health Professions ("Defendant," "IHP," or "the Institute"; together with Plaintiff, the "Parties"), alleges as follows:

## INTRODUCTION

1.      Plaintiff brings this Complaint against IHP to address IHP's egregious and unlawful religious, ethnic, and national origin based discrimination that he was and continues to be subjected to in violation of federal anti-discrimination laws and IHP's own policies.

2.      Plaintiff is an intelligent and driven physical therapy student.  His classmates describe him as hardworking, supportive, empathetic, patient, and someone who takes his education very seriously.

3.      After graduating *Magna Cum Laude* from the University of California, Los Angeles, Plaintiff decided to continue his education and become a physical therapist.  Plaintiff was accepted into several physical therapy programs, but chose to attend IHP as he believed their program would best equip him to become a leading physical therapist.

4.      IHP claims that it not only upholds the "highest standards of professional, academic, and scholarly excellence," but that it also fosters an "inclusive and welcoming

DocuSign Envelope ID: 1C60D311-2E76-4F9A-9101-573EDA3CB20F

environment where every person is treated with dignity and respect."[1]  Accordingly, Plaintiff also believed that IHP would provide him with a safe and inclusive learning environment to obtain his Doctorate in Physical Therapy.

5.      Unfortunately, Plaintiff's experience was the exact opposite of what IHP represented.  As described in this Complaint, IHP faculty members openly harassed Plaintiff for being Jewish and questioned his ability to equitably treat physical therapy patients based on their own anti-Semitic, anti-Israeli, and anti-Middle Eastern prejudices.  Then, after Plaintiff voiced his concerns about these expressions of prejudice, IHP escalated its campaign to frustrate his academic pursuits, including continuing to give him lower grades than he deserved, fabricating allegations of his failure to meet program standards, creating program requirements for him that other students were not required to fulfill, and denying him opportunities that were available to other students. To this day, IHP continues to discriminate and retaliate against Plaintiff by refusing to give him his well-earned physical therapy degree for disingenuous reasons.

6.      Plaintiff has endured and continues to endure extensive harm and damages as a direct result of IHP's anti-Semitic, anti-Israeli, and anti-Middle Eastern discrimination and retaliatory conduct against him, including substantial costs involved with IHP delaying Plaintiff's graduation from the Physical Therapy Program by almost two years.

7.      IHP's discrimination must be stopped, and Plaintiff should be awarded damages for IHP failing to provide him with an education free from discrimination.

---

[1] *a. Mission, Vision, and Core Values*, MGH Institute of Health Professions, https://mghihp.smartcatalogiq.com/current/faculty-handbook/i-introduction/a-mission-vision-and-core-values/ (last visited Mar. 3, 2024).

8.      Plaintiff seeks injunctive relief and money damages under federal and common law claims arising out of IHP's unlawful discrimination and retaliation against him because of his status as a Jew, specifically an Orthodox and Middle Eastern Jew of Israeli descent.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1334 over the claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d. *et seq.*).  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's remaining state law claims because they are so related to the Title VI claims they arise out of the same case or controversy.

10.      This Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because the Parties are citizens of different states and the amount in controversy exceeds $75,000.

11.      This Court has personal jurisdiction over Defendant because it is based and operates in Boston, Massachusetts.

12.      Venue in the District of Massachusetts is proper pursuant to 28 U.S.C. § 1391 because Defendant resides in the district, and a substantial part of the events giving rise to Plaintiff's claims occurred in the district.

## PARTIES

13.      Plaintiff is a 31-year-old American of Iranian and Israeli descent and a current student in IHP's School of Health & Rehabilitation Sciences.  He is an Orthodox Jew, and his parents and grandparents were born in Iran.  He is domiciled in the State of California.

14.      Defendant MGH Institute of Health Professions is a not-for-profit health professions graduate school that is incorporated under the laws of the State of Massachusetts and

has its principal place of business in the State of Massachusetts.  It was founded by Massachusetts

General Hospital, which is the original and largest teaching hospital of Harvard Medical School.[2]

15.     IHP is a recipient of federal financial assistance.  IHP has received at least $26

million in federal grants since Plaintiff enrolled in the school,[3] and $1.2 million in federal funds

directly allotted to students during the COVID-19 pandemic.[4]

16.     IHP is subject to Title VI as a recipient of federal financial assistance.

17.     IHP's School of Health and Rehabilitation Sciences offers a Doctor of Physical

Therapy degree program ("PT Program").  The cost of the PT Program in 2019 was fixed at

$147,035.[5]

## FACTUAL ALLEGATIONS

18.     Plaintiff graduated from the University of California, Los Angeles in June 2017

with a major in psychology and a 3.812 cumulative GPA.

19.     In the summer of 2019, Plaintiff enrolled at IHP to obtain a Doctorate in Physical

Therapy.  Plaintiff chose IHP despite being accepted into several other physical therapy programs.[6]

---

[2] Massachusetts General Hospital, https://www.massgeneral.org/ (last visited Mar. 3, 2024).

[3] *Find a Recipient Profile*, U.S. Dep't of Treasury, https://www.usaspending.gov/recipient (last visited Mar. 3, 2024).

[4] *CARES, CRRSAA, & ARP*, MGH Institute of Health Professions, https://www.mghihp.edu/admissions/financial-aid-billing/financial-aid/cares-crrsaa-arp (last visited Mar. 3, 2024).

[5] *School of Health and Rehabilitation Sciences Tuition Calculator 2019-2020 Academic Year*, MGH Institute of Health Professions, https://mghihp.formstack.com/forms/tuition_calculator_shrs_19_20 (last visited Mar. 3, 2024).

[6] One of Plaintiff's classmates, who has learning disabilities, described himself as lucky to have a classmate like Plaintiff, as Plaintiff spent countless hours helping explain difficult concepts to his classmate in need.  One of Plaintiff's clinical instructors described him as someone who is open to challenging questions and who treats patients in a safe and meaningful way.  By all accounts, Plaintiff is the type of student that should thrive academically.

**A.  Plaintiff's First Experience With Anti-Semitism And Unfair Grading At IHP**

20.    In November 2019 – five months after enrolling at IHP – Plaintiff took part in Physical Therapy ("PT") course 604N Patient/Client Management: CVP 1 and PT 605N Patient/Client Management: CVP 2 with Assistant Professor Dr. Rania Karim.

21.    While Plaintiff was practicing hands-on skills with a classmate, Dr. Karim saw Plaintiff's Star of David necklace, which had fallen out of his shirt.  Dr. Karim asked Plaintiff what his nationality was.  Plaintiff responded that he was Israeli-Iranian and that the necklace was a symbol of his Jewish faith.  In response, Dr. Karim looked at Plaintiff with hatred and disgust.  Dr. Karim then shook her head, said that she is Lebanese-Palestinian, and proceeded to turn her back on Plaintiff and walk away.  The incident was witnessed and corroborated by one of Plaintiff's classmates.

22.    Dr. Karim's response to Plaintiff's disclosure that he is Jewish and Israeli-Iranian humiliated and worried Plaintiff so much that he stopped wearing his Star of David necklace – which he previously wore every day – to Dr. Karim's class.

23.    Dr. Karim was subsequently designated as Plaintiff's grader for his PT 605N practical examination in December 2019.  Dr. Karim gave Plaintiff an undeserved and unfounded poor grade for this practical examination.

24.    Plaintiff knew he did not deserve the grade and appealed it.  IHP agreed that Dr. Karim improperly graded Plaintiff.  Dr. Shweta Gore, Interim Director of Academic Curriculum at IHP, emailed Plaintiff on December 10, 2019 to inform him that "[t]he 605 faculty discussed the clinical reasoning process you utilized in the moment during the practical.  Based on this, we all felt comfortable changing your score . . . ."

25.     Shortly thereafter, Plaintiff reported Dr. Karim's hostility and discriminatory treatment towards him to another PT 605 course instructor, Mr. Christopher Clock. Plaintiff told Mr. Clock about Dr. Karim's antagonistic reaction to seeing his Star of David necklace and learning that he was Jewish and Israeli, about the improper poor grade he received on a practical exam that she graded soon after, and how the grade was subsequently changed. Plaintiff expressed his concern that Dr. Karim would continue to grade him unfairly, given her overt prejudice against him, and requested from Mr. Clock that Dr. Karim not grade any of his future practical exams.

**B.  Plaintiff Is Subjected To Shocking Anti-Semitic, Anti-Israeli, And Anti-Middle Eastern Sentiment From IHP Faculty**

26.     In April 2021, Plaintiff was enrolled in course PT 742N Clinical Experience II, which he was fulfilling with a clinical rotation at Bay State Physical Therapy in Stoughton, Massachusetts.   Plaintiff's Clinical Instructor ("CI") at Bay State was Dr. Amanda Driscoll and the course was graded by Plaintiff's Clinical Advisor, Director of Clinical Education and Assistant Professor at IHP, Dr. Donna Applebaum.

27.     On or about April 19, 2021, Plaintiff met with Dr. Driscoll to go over his Clinical Performance Instrument ("CPI"), which is used to evaluate student performance during clinical rotations.  Plaintiff was surprised to see that Dr. Driscoll gave him poor marks on his CPI, as Dr. Driscoll relayed only positive verbal feedback about Plaintiff's performance during this meeting. Plaintiff asked Dr. Driscoll to explain the discrepancy, to which she replied that she uses different grading standards than other CIs, and evaluates students based on the potential that she sees in them.

28.     The American Physical Therapy Association (APTA) manual for CIs outlines the accepted principles of performance rating, which includes rating based on definite observations. The manual explicitly warns CIs to be aware of their unconscious biases and how those biases may

affect grading. One example cited is that CIs tend to predict that white students will perform better than minority students.[7]

29.     Upon information and belief, Plaintiff's poor marks were based on Dr. Driscoll's bias against him as a minority student, specifically a Jewish student of Israeli and Middle Eastern descent, rather than on Plaintiff's actual PT skills.

30.     Plaintiff did not agree with Dr. Driscoll's evaluation of his potential rather than his performance, which he felt was discriminatory, and he knew that this method of evaluation was not permitted by the APTA. Plaintiff thus did not agree to sign his CPI. As a result of this, Plaintiff was informed on April 21, 2021 that he did not pass PT 742N. He was not allowed to continue working at his clinical rotation and learning critical skills necessary for the next steps in the PT Program.

31.     The PT Program presented Plaintiff with a plan to continue his studies – despite Dr. Driscoll's improper evaluation causing him to be unsuccessful in PT 742N – on or about May 1, 2021 (the "PT Plan"). Plaintiff felt he had no choice but to follow the PT Plan, as his studies would otherwise be put on pause until he came to an agreement with the school. One condition of the PT Plan was that Plaintiff agreed to meet regularly with Mr. Clock, who was Plaintiff's academic advisor by that point, as well as Dr. Applebaum and Emile R. "Mike" Boutin Jr., Assistant Dean for Faculty and Student Success.

32.     During one meeting with Mr. Clock in May 2021, Mr. Clock asked Plaintiff "how would you approach treatment of a patient that is Palestinian?" During another meeting in the IMPACT Center on IHP's campus (the "Center"), Mr. Clock asked Plaintiff what Plaintiff's thoughts were on the Israeli-Palestinian conflict, and whether Plaintiff felt that the actions of the

---

[7] *APTA Credentialed Clinical Instructor Program – Level 1* at 98, 100 (2023).

Palestinian people during the conflict were justified.  Mr. Clock's questions and tone indicated to Plaintiff that Mr. Clock thought he would be unwilling or unable to competently treat Palestinian patients due to his status as an Israeli and Middle Eastern Jew.

33.     During a meeting with Dr. Applebaum in May 2021, Dr. Applebaum asked Plaintiff what his views were towards women.  She explained that she was asking Plaintiff this question because Plaintiff is Jewish and Middle Eastern, and she felt people of his religion and culture might have a different stance towards equal treatment of women.  Plaintiff felt targeted by Dr. Applebaum's implication that that he may treat women differently due to his status as an Israeli and Middle Eastern Jew.

34.     Mr. Boutin similarly asked Plaintiff what his thoughts were towards women during a meeting around May 2021. Mr. Boutin explained that based on Plaintiff's religion, he must view women differently.  Mr. Boutin also told Plaintiff to be "aware" of his presence as a Middle Eastern man in the workplace.  Again, Plaintiff felt targeted by Mr. Boutin's implication that that he may treat women differently due to his status as an Israeli and Middle Eastern Jew.

35.     The comments from three different IHP faculty members about his religion and implied comments that it might affect the way he treats patients made Plaintiff feel very uncomfortable.  Instead of getting support from the IHP faculty, these faculty members openly displayed prejudice against Plaintiff because of his religion and his national origin.

## C. IHP Continues To Systematically Discriminate Against Plaintiff And Directly Prevents Him From Passing A Crucial Exam

36.     As another condition of the PT Plan, Plaintiff was required to enroll in PT 880 in the summer of 2021 with Assistant Professor Dr. Jane Baldwin, despite not being allowed to complete the prerequisite course PT 742N.  Dr. Baldwin acknowledged that Plaintiff's enrollment in her course was "out of sequence" as IHP had not permitted him to pass PT 742N given he

refused to sign his CPI (after being improperly evaluated by Dr. Driscoll in violation of the APTA manual). Mr. Clock similarly agreed during a meeting with Plaintiff that he should not have been placed in the class.

37. Despite his premature enrollment in PT 880 as part of the PT Plan, Plaintiff did everything that he could to be successful in the course. He practiced the course material with another PT student who attested to Plaintiff's competence in the course. A former PT student, who would return to campus to assist students on a pro bono basis, also offered to assist Plaintiff in this course because she felt that Dr. Baldwin was unusually harsh towards Plaintiff. After telling Plaintiff to prematurely enroll in PT 880 as part of the PT Plan, IHP then informed Plaintiff that he was not on track to pass the course. Plaintiff thus had to withdraw from the course at his own expense.

38. In July 2021, Plaintiff was informed by the PT program that he would have to do a second clinical rotation to complete PT 742N, and that he could not take his Curricular Comprehensive Practical Exam ("CCPE") until the rotation was completed. This meant that Plaintiff would not be taking the CCPE at the same time as the rest of his classmates.

39. Plaintiff was immediately concerned by this news, as he had been told that students typically prepared in groups for this exam. Since Plaintiff would be taking it at a different time than the rest of his classmates, he was worried that studying alone would harm his prospects of success. Plaintiff expressed his concerns to Mr. Clock, who assured Plaintiff that he would have adequate support.

40. Plaintiff successfully completed PT 742N Clinical Experience II in December 2021 with a clinical rotation at Spaulding Outpatient Center in Braintree, Massachusetts. Despite being instructed by IHP to be "tough" on Plaintiff during this clinical rotation, Plaintiff and his CI, Dr.

Erin Krey, developed a very positive professional relationship.  Dr. Krey wrote on his CPI that Plaintiff "continues to act in a professional manner with both patients and peers," that he is "open to feedback and takes responsibility for his actions," he "consistently provides sound clinical reasoning," and he is able to "determine a diagnosis and prognosis for orthopedic patients" with "only occasional guidance."  Plaintiff earned "entry-level physical therapist" markings in almost all sections of his evaluation – the marking which was required in order to pass PT 742N Clinical Experience II.

41.    Plaintiff then started preparing to take his CCPE, but he was given different instructions than the rest of his classmates on how to prepare for the exam and was treated differently than his fellow classmates throughout the preparation, administration, and grading of the CCPE.

42.    While Plaintiff's classmates had lab instructors, professors, and other classmates as resources to study for the exam, Plaintiff was told that he must study independently and could not avail himself of these resources.  One of Plaintiff's classmates said that "extensive resources were afforded by the IHP to help our class succeed, such as: lab instructors, access to school equipment and study rooms.  Our cohort thoroughly prepared for all seven cases in large groups, small groups and one-on-one to break down each complex case."  Plaintiff, in contrast, was told "[f]aculty will not be a key resource for you during this phase.  You should not email or contact faculty, lab instructors, or clinical instructors with questions regarding the cases or your preparation for the exams."

43.    The one faculty member Plaintiff was permitted to contact with questions regarding the exam was Dr. Keshrie Naidoo, a different point of a contact than the rest of his cohort was

DocuSign Envelope ID: 1C60D341-2E76-4F9A-9101-5735DA3CB20F

given.  When Plaintiff asked Dr. Naidoo his questions about the exam, she failed to assist him, and instead told him to use his clinical judgment.

44.     Instead of providing Plaintiff with access to IHP faculty like the rest of his classmates, Dr. Applebaum encouraged Plaintiff to work with a private tutor that she recommended to help him prepare for the CCPE.  While other PT students were provided tutors free of charge by the school, Plaintiff's GPA was too high to be eligible for this benefit.  Thus, Plaintiff had to pay for the tutor out-of-pocket.

45.     Plaintiff agreed to work with the tutor because he knew that he would otherwise be disadvantaged, given that his classmates were all receiving assistance in preparing for the exam. He worked out a payment plan with the tutor and met with her for about three sessions.  Then, Dr. Naidoo contacted Plaintiff's tutor and told her that she could only assist Plaintiff with general clinical reasoning, and could not answer any CCPE specific questions.  Plaintiff had already contracted with the tutor to pay for additional sessions under the impression that the tutor would be allowed to answer his case specific questions, so he continued to meet with her despite not obtaining any substantive benefit.

46.     Plaintiff again tried to confide in Mr. Clock regarding his concerns that he was being denied resources to prepare for the CCPE that were afforded to the rest of his classmates. Mr. Clock did not assure Plaintiff and instead told him that he was a "special circumstance" and should continue to study independently.

47.     All PT students were given the opportunity to study in the Center to prepare for the CCPE.  Plaintiff's allotted time slot to access the Center was initially scheduled for a Friday evening, despite Plaintiff previously informing the school that he observes the Jewish Sabbath and cannot do any schoolwork from sundown on Friday to sundown on Saturday.

48.     IHP rescheduled his allotted time slot at the Center, and Plaintiff was eventually able to access the Center for a single two-hour session. During this session, Plaintiff was permitted to have a fellow classmate present, but only as a "mannequin" who could not provide any feedback or assistance. This was vastly different from the collaborative assistance and preparation the other students were allowed to receive from their peers who helped them prepare. Furthermore, the rest of the students in Plaintiff's cohort were allowed access to the Center on multiple days, for sessions exceeding two hours in length, and with instructors present for assistance.

49.     On February 8, 2022, Plaintiff took the CCPE. Dr. Baldwin – who was noticeably harsh towards Plaintiff during PT 880 – was designated as one of the graders for this exam.

50.     During the CCPE, all of Plaintiff's classmates encountered unknown individuals who acted as the mock physical therapy patients. Conversely, Plaintiff is the only member of his cohort who had an IHP faculty member acting as both a proctor and a participant during the exam. This faculty member, Dr. Naidoo – who refused to answer Plaintiff's questions while preparing to take the CCPE – did not disclose to Plaintiff that she would be participating in this way. Plaintiff lost crucial time during the exam figuring out that Dr. Naidoo – who had just escorted him from the preparation room to the exam room speaking to him as a faculty member – was now a participant whom he was supposed to elicit information from to help diagnose and treat the mock patient. This negatively affected Plaintiff's performance, as explained by one of his classmates: "having to conduct a practical examination with a professor in the room would only intensify an already stressful experience." The added stress, coupled with the lost time, significantly disadvantaged Plaintiff as compared to the rest of his classmates, and Plaintiff did not pass the CCPE on that day.

51.     Plaintiff requested to retake the exam as soon as possible given his initial CCPE had already been delayed by IHP by seven months at that point.  Plaintiff was told that he had to wait eight days before he could retake the exam.  Meanwhile, his classmates who had not passed the first time were allowed to retake the exam within three days.

52.     On February 9, 2022, Plaintiff met with the graders of his CCPE – Dr. Baldwin and Dr. Gore – to review his performance and prepare for his retake.  In a write up after the call, the graders wrote that the meeting was positive and that Plaintiff was "receptive to the feedback and took notes during the meeting in order to improve on his retake."

53.     Plaintiff tried to reach out to Mr. Clock for assistance in preparing for the retake. Mr. Clock once again told Plaintiff that he was a "special circumstance" and that Mr. Clock's "hands are tied," so he could not help Plaintiff prepare for the retake.

54.     Subsequently, Plaintiff discovered that the grading from his exams did not accurately reflect his performance during his CCPE.  For instance, Plaintiff was marked down by Dr. Baldwin for allegedly dropping a pulse oximeter on the floor during the exam.  As described in Paragraph 63, Plaintiff was eventually allowed to review the video footage taken during the exam, which showed him properly placing the pulse oximeter on the mock patient without dropping it.

55.     On February 16, 2022, Plaintiff retook the CCPE.  Dr. Karim was designated as one of the graders for Plaintiff's CCPE retake, despite Plaintiff having reported Dr. Karim's hostile and prejudicial behavior towards him to Mr. Clock and Plaintiff's request that Dr. Karim *not* grade him anymore, after she gave him an undeserved poor grade that was subsequently revised. Unsurprisingly, Dr. Karim did not give Plaintiff a passing grade on the CCPE retake.  Plaintiff

passed the written examination portion of the CCPE and had a 93 grade point average in the course prior to the practical portion.

56.     IHP's course of conduct leading up to the CCPE and CCPE retake preordained Plaintiff's failure.  Plaintiff was forced to prematurely withdraw from PT 880, a course which would have better situated him to pass the practical portion of the CCPE, after Dr. Baldwin treated him harshly.  Throughout his preparation for the CCPE, Plaintiff was denied access to the advantageous resources that were accessible to all other students.  In taking the CCPE, Plaintiff was subjected to different exam conditions than the rest of his classmates by having Dr. Naidoo – who had previously refused to answer Plaintiff's questions leading up to the exam – proctor and participate.  Finally, Plaintiff was graded by faculty that had previously proven to improperly grade him (Dr. Karim) and treat him harshly (Dr. Baldwin).

**D.  IHP Continues To Take Adverse Academic Actions Against Plaintiff By Unjustifiably Dismissing Him From The PT Program And Denying His Appeals**

57.     On February 18, 2022 – two days the CCPE retake – then Chair of the PT Program, Dr. Laura Plummer, emailed Plaintiff stating that he was being dismissed from the PT Program. She also wrote that his badge was deactivated, that he was not allowed to contact his graders, and that he was not allowed to come back to campus.  The PT Program also removed Plaintiff's access to the IHP page and course information.

58.     Dr. Plummer failed to inform Plaintiff in this email of his right to appeal his academic dismissal.

59.     IHP policy is that students' ID Cards are only deactivated when their dismissal is final,[8] but Plaintiff's ID card was immediately deactivated on February 18, 2022.  Students' Mass

---

[8] *Systems Actions Post-Dismissal*, MGH Institute of Health Professions, https://mghihp.smartcatalogiq.com/2021-2022/catalog/academic-policies/dismissal-policy/systems-actions-post-dismissal/ (last visited Mar. 12, 2024).

General Brigham logon and D2L, which allow access to all instructor and course related information, should remain active for seven days after the dismissal is final.[9]  Despite the Institute's policies, Plaintiff was immediately denied access to these resources – imposing another hardship during his eventual appeals.

60.     While reviewing the grading rubrics from the CCPEs, Plaintiff noticed that there were discrepancies between some of the points that he was marked down on and his recollection of what happened during the exams.

61.     Plaintiff emailed Dr. Plummer and Mr. Clock to ask if he could review the video footage taken during his exams.  He was told that it was only possible to view the recordings on campus due to the system setup.  However, Plaintiff was precluded from coming to campus, as his badge was already deactivated and he had been told not to return.

62.     Unsure where else to turn for assistance, Plaintiff emailed IHP's Title IX Coordinator, John Gormley, on February 21, 2022 and requested that Mr. Gormley connect him with the school's ombudsman.  Mr. Gormley responded that the school does not have an ombudsman.

63.     Eventually, on March 7 and 8, 2022, Dr. Plummer agreed to meet with Plaintiff via Zoom to review the video footage taken during his CCPEs (despite being previously told that it was only possible to view these recordings on campus).  Plaintiff confirmed that there were discrepancies between the grading rubrics and the recordings.  For instance, Dr. Baldwin gave Plaintiff a "critical error" for dropping a pulse oximeter on the floor and not using it to monitor the mock patient's vitals.  However, Plaintiff carefully reviewed his video performance and did not see this instance occur.  As another example, Plaintiff received feedback that he did not mention

---

[9] *Id.*

deep breathing when walking with the mock patient.  Plaintiff's review of the video reveals that

he instructed the patient to incorporate pursed lip breathing while walking from the chair to the

table.  Plaintiff thus *did* take the precise step that he was graded down for *not* taking.  Plaintiff

asked for a copy of the video footage, but his request was denied.

64.     After confirming his suspicions that his grading rubrics did not accurately reflect

his performance on the CCPEs, Plaintiff appealed his course grade for PT 814N and PT 815N.  He

had to first directly appeal to the graders of his CCPEs.  The failing grade on his CCPEs resulted

in a failing grade for these courses, despite Plaintiff passing the written examination.  In his appeal,

Plaintiff highlighted that he received all As and Bs in his first five semesters of the PT Program.

He also provided thorough and detailed responses to the feedback he received from his graders,

and highlighted the inconsistencies such as the pulse oximeter incident.

65.     On March 16, 2022, Plaintiff was granted a Grade Challenge Appeal Meeting.

66.     Unsurprisingly, the original graders of Plaintiff's CCPEs (including Dr. Karim)

upheld their original assessment and denied Plaintiff's grade appeal on March 22, 2022 via a letter.

67.     Plaintiff was informed again on March 29, 2022, that he was being dismissed from

the PT program.

68.     On April 12, 2022, Plaintiff appealed his dismissal from the PT Program to the

Committee on Academic Policies and Procedures ("CAPP") on the basis of procedural error and

discrimination.  For procedural error, Plaintiff highlighted how in his first appeal, he provided

detailed and specific evidence corroborated by the videos taken during the CCPEs that contradicts

the feedback on his grading rubric.  The letter he received on March 22, 2022 ignored many of

these specific concerns.  For instance, the letter did not even mention the discrepancy with the

pulse oximeter. Thus, Plaintiff's original grade challenge was not sufficiently reviewed and reflected a procedural error.

69. For discrimination, Plaintiff again reported his encounter wherein Dr. Karim saw his Star of David necklace, learned that he was an Orthodox Jew of Israeli ancestry, and treated him with hostility right before unfairly grading him on a practical examination. He noted that Dr. Karim was one of the graders of his CCPE retake, despite his reasonable request to exclude her from grading him after the previous poor grade she awarded him was overturned. He also informed the committee of his encounters with Mr. Clock, Dr. Applebaum, and Mr. Boutin, who questioned Plaintiff's ability to effectively treat patients due to their biases against him based on his religion, ethnicity, and national origin. He then described the differential treatment he received while studying for the CCPE as compared to the rest of the students in his cohort, which included taking it at a later date, being forced to study alone, not having his questions answered by his one faculty contact, only having access to the Center once, waiting eight days to retake the exam instead of three, and so forth.

70. Plaintiff asked for further review of his dismissal, and for Dr. Naidoo, Dr. Karim, Dr. Baldwin, Mr. Clock and Dr. Applebaum to be excluded from such review to ensure the independence of any decision made.

71. At this point, Plaintiff hired an attorney, Sean Laporta, to assist him with his appeal. Plaintiff requested that his attorney be present at the CAPP meeting. Plaintiff was told that neither party involved may have an attorney present at the meeting per IHP Hearing Committee Policy. However, the IHP Hearing Committee Policy does not include any such prohibition on parties having attorneys present. [10]

---

[10] *Hearing Committee*, MGH Institute of Health Professions, https://mghihp.smartcatalogiq.com/current/faculty-handbook/xii-bylaws-of-the-faculty/standing-rules-of-committees/hearing-committee/ (last visited Mar. 13, 2024).

72.      CAPP met on April 25, 2022 to consider Plaintiff's appeal of his dismissal from the PT Program.  Plaintiff requested an audio recording of this meeting, which was denied without cause.

73.      On April 28, 2022, CAPP affirmed Plaintiff's dismissal from the PT Program.  In a short, three paragraph email, Dr. Plummer wrote that that committee was denying the appeal because they did not have enough "available information" to support Plaintiff's claims of "procedural error and bias."  This email did not directly address *a single one* of Plaintiff's claims of bias and discrimination, nor did it assure Plaintiff that the faculty he named were not involved in the decision.

74.      The IHP Hearing Committee policy specifically says that "Committee members must notify the committee chair if they need to recuse themselves from a hearing due to conflict of interest."[11]  The Institute failed to inform Plaintiff on whether they followed this policy.

**E.   Plaintiff Initiates A Student Grievance Procedure And IHP Reverses His Dismissal Without Acknowledging Its Discriminatory Practices**

75.      Following the CAPP decision, Plaintiff filed a civil complaint with the Massachusetts Commission Against Discrimination ("MCAD complaint") on the basis of "Religious Creed (Jewish), [and] Race/Color (Middle Eastern)" discrimination.  MCAD's investigation into IHP is still ongoing.

76.      On May 12, 2022, Plaintiff initiated a Student Grievance Procedure, writing to the Chair of the Student Grievance Hearing Panel, Lisa Moran, and the Dean of Health and Rehabilitation Sciences, Dr. Leslie G. Portney.  He wrote that his grievance stems from the discriminatory, biased, unfair and unequal treatment he has received while a PT student, citing many of the same concerns detailed in his last appeal (*see* ¶¶ 68–69).  He also highlighted that

---

[11] *Id.*

CAPP would not provide him with limited assurance that the individuals he identified as conflicts of interest were not involved in the CAPP dismissal, and how the decision letter did not directly address *a single one* of his concerns.

77.    In his letter to initiate his Student Grievance, Plaintiff also attached a litigation hold letter from his attorney, Mr. Laporta.   The litigation hold notified IHP faculty that they must preserve and retain any electronic information that may be relevant to litigation concerning Plaintiff's dismissal, treatment, and evaluation of him, including the recordings of his CCPEs.

78.    In response to the litigation hold, IHP finally provided Plaintiff with a copy of the videos taken during his CCPEs on May 25, 2022.

79.    Plaintiff's Student Grievance Hearing was held on June 15, 2022.   Plaintiff again requested that his attorney be present at the hearing and his request was once again rejected.   IHP's policy for Student Grievance Hearings does currently say that neither party may have an attorney present at the hearing, but Plaintiff reviewed the policy when preparing for his hearing and found no such prohibition on having an attorney present.   Upon information and belief, IHP did not prohibit attorney presence, nor otherwise mention attorneys in its policy for Student Grievance Hearings, at the time of Plaintiff's request.

80.    After hearing all the evidence of the unequal treatment Plaintiff received while studying at IHP, the Student Grievance Hearing Panel reversed Plaintiff's dismissal from the PT Program on June 23, 2022.   In its decision, Ms. Moran wrote:

> After careful deliberation on (a) the Institute's policies and procedures, (b) supporting documentation provided by you and by the Department of Physical Therapy, as well as (c) testimony provided by you and by Dr. Plummer and Dr. Fitzgerald at your hearing, the Hearing Panel determined that **information was presented to support, in part, a claim of inequitable application of the Institute's existing rules.**

(emphasis added). While IHP acknowledged that they did not equitably apply the rules in Plaintiff's case, the decision failed to address any of his claims of bias and discrimination.

81.     When IHP responded to the MCAD complaint, it did not address any wrongdoing and instead claimed that Plaintiff's reinstatement was due to the "governing body determin[ation] that due to the program falling out of sequence, in part because of the Covid-19 pandemic, which was out of the Complainant's control, it would be fair to offer him reinstatement to the Program so that he could complete the Program in sequence." However, there was no mention of Covid-19 in the reinstatement letter sent to Plaintiff on June 23, 2022, and Plaintiff had never heard of the pandemic being a factor in the different treatment he received from IHP as compared to other students.

82.     Plaintiff was told to coordinate a plan of study that meets the requirements for the PT Program curriculum with Dr. Plummer.

### F. IHP Continues To Take Adverse Actions Against Plaintiff By Unfairly Grading Him And Arbitrarily Delaying The Receipt Of His Degree

83.     On July 5, 2022, Dr. Plummer emailed Plaintiff informing him of his outstanding coursework needed to complete his PT degree: PT 880N, 814N, 815N, and 843N.

84.     Plaintiff responded to Dr. Plummer expressing his significant concerns with her plan, as it would require him to retake Dr. Baldwin's class that he was previously forced to withdraw from at his own expense (PT 880N). It would also require him to retake the CCPE courses (PT 814N and 815N), which Plaintiff already passed the written exam for and had a 93 grade point average in prior to the practical portion. Plaintiff shared his concerns with Dr. Plummer, along with his fears of coming back to campus after the treatment he faced from various IHP faculty – including Dr. Plummer herself, who had told Plaintiff not to return to IHP's campus.

85.     Plaintiff requested a meeting with the Hearing Committee to address his concerns with his academic plan moving forward.  IHP ignored Plaintiff's request for such a meeting.

86.     Instead, the new interim dean of the PT Program, Dr. Marjorie Nicholas, reached out to Plaintiff on July 19, 2022.  Dr. Nicholas agreed to meet with Plaintiff and speak to Dr. Plummer, but she informed Plaintiff that she was on vacation and would not reach back out to him to schedule a meeting until later in the month.

87.     Dr. Nicholas did not make herself available to meet with Plaintiff until August 4, 2022.

88.     Dr. Nicholas subsequently took another vacation and waited until August 22, 2022 to inform Plaintiff that she supported Dr. Plummer's original plan.

89.     Dr. Plummer did offer Plaintiff an alternative plan of study, but this alternative plan would have him wait until the summer of 2023 to repeat the same courses with Dr. Applebaum and Dr. Karim.  Without assurances that he would be treated fairly in these courses, Plaintiff could not agree to the plan.

90.     On August 24, 2022, Plaintiff proposed his own alternative to complete PT 880N and PT 843N in California.  Plaintiff had previously received approval from Dr. Applebaum to complete these courses in California and he had already moved there by this time given the uncertainty in his academic path forward at IHP.

91.     Since little progress had been made on finalizing Plaintiff's plan of study moving forward at IHP, he consulted outside assistance.  On November 10, 2022, Denise Katz-Prober, the Director of Legal Initiatives at The Louis D. Brandeis Center for Human Rights Under Law, sent a letter to Melissa Brennan, Senior Legal Counsel at the Mass General Brigham Office of the General Counsel.  The purpose of the letter was to urge IHP to provide Plaintiff with an alternative

study plan that would allow him to complete his PT degree, graduate in a timely manner, and in a "nondiscriminatory environment." The letter stated that the school has an obligation under Title VI to ensure Plaintiff "has equal access to the educational benefits of the PT Program," and highlighted that currently Plaintiff's experiences "reflect[] a pattern of mistreatment that Jewish Americans have increasingly faced in recent years, especially on American college campuses, where Jews are often harassed and discriminated against on the basis of their shared ancestry and ethnic identity." This letter is attached hereto as **Exhibit 1**.

92.     Plaintiff also hired another attorney to assist him at this time: Peter Levitt. Mr. Levitt also wrote to Melissa Brennan on November 10, 2022, stating that "MGH PT program's 'inequitable application of the Institute's existing rules' in administering the practical examination was a product and continuation of the harassment and discrimination that Mr. Plaintiff has faced throughout much of his tenure at the MGH PT program based on his Jewish ancestry and ethnic (i.e., 'national origin') identity." He proposed an "alternative plan of study to enable Mr. Plaintiff to graduate and receive his doctorate from the MGH IHP program without him having to return to campus."

93.     Eventually, IHP permitted Plaintiff to retake his CCPE without first having to repeat PT 814N and PT 815N. Plaintiff retook and passed the CCPE in May of 2023, a full 10 months after he first tried to coordinate his plan of study with Dr. Plummer. This time, Plaintiff's CCPE was graded by Dr. Lesley Smith, someone who, upon information and belief, had no knowledge of Plaintiff's religion nor national origin.

94.     In the summer of 2023, Plaintiff successfully completed PT 880N with an independent study in California.

95.     On June 26, 2023, Plaintiff enrolled in his last course required to complete his PT degree: PT 843N.  Plaintiff planned to fulfill this course with a clinical rotation at Concentra Medical Center in Los Angeles, California.  His CI was Dr. Alexander Chan and his clinical advisor was Dr. Monica Arrigo, who are part of the Clinical Education Team at IHP.

96.     Upon information and belief, Dr. Chan received the same instructions from IHP as his last CI (Dr. Krey) to "be tough" on Plaintiff, as evidenced by the differential treatment he received during this clinical rotation.  For instance, Dr. Chan went on vacation for two weeks during Plaintiff's time at Concentra, and Plaintiff was relocated to another medical center at this time.  There was another student doing a clinical rotation at Concentra at the same time as Plaintiff who was not asked to relocate during Dr. Chan's absence.  When Plaintiff inquired into the reason behind his differential treatment, Dr. Chan told Plaintiff that his temporary transfer was due to the fact that Plaintiff needed "a tough clinical instructor" to supervise him.

97.     Plaintiff also started receiving inconsistent feedback during his time at Concentra. Plaintiff had periodic meetings with Dr. Arrigo and Dr. Plummer via Zoom, and during these meetings the IHP faculty would speak neutral or positively about the feedback they received from Dr. Chan regarding Plaintiff's performance.   However, Plaintiff would receive written correspondence following these meetings that was entirely inconsistent with what he was told during the meetings.

98.     Plaintiff met with Dr. Chan on or about August 22, 2023.  Dr. Chan told Plaintiff that he was on the right trajectory to pass the clinical rotation and the course.  Dr. Arrigo was present at this meeting as well.

99.     However, on September 9, 2023, Dr. Arrigo emailed Plaintiff telling him that he was at risk of not passing the course.  This is inconsistent with what Dr. Chan told Plaintiff.

100.    Plaintiff reviewed his final CPI with Dr. Chan on September 29, 2023.  While reviewing the CPI, Plaintiff discovered inconsistencies and inaccuracies in the feedback provided. For example, Dr. Chan had written that Plaintiff had a patient recovering from an ACL surgery do a certain physical therapy exercise while standing, which would have been improper for that patient.  However, Plaintiff previously suffered from an ACL injury in the past, so he knew from personal experience that such patients should not do standing exercises.  Plaintiff expressed this to Dr. Chan, who backtracked and admitted that he was uncertain whether that feedback was accurate.

101.    Once again, Plaintiff knew that Dr. Chan's evaluation of his performance was not in line with the accepted principles of performance rating highlighted by the APTA.  Plaintiff asked Dr. Chan to give him examples that would support Dr. Chan's grading of Plaintiff at less than entry-level.  Dr. Chan acknowledged to Plaintiff that he did not have examples for many of the areas, had inaccurate examples (as discussed above), or was only able to cite to one incident.  The APTA manual says that ratings must be based on definite observations, and on "typical and frequent manner of performance, not isolated instances."[12]

102.    Plaintiff also asked Dr. Chan during their final meeting why he never directly told Plaintiff that he was at risk of failing, as he had only heard this from IHP faculty over in Boston and not from anyone he was actually working with Plaintiff in California.  Dr. Chan simply acknowledged that he never indicated directly to Plaintiff that he was at risk of failing the internship.

103.    Dr. Chan's unreliable assessment of Plaintiff is also inconsistent with the glowing Clinical Performance Evaluation that he received from his previous CI, Dr. Krey (*see* ¶ 40).

---

[12] *APTA Credentialed Clinical Instructor Program – Level 1* at 98 (2023).

104.     On October 2, 2023, Plaintiff requested a meeting between himself, Dr. Chan, Dr. Arrigo, and Dr. Plummer to discuss the discrepancies in the feedback Plaintiff was receiving.  IHP rejected this request.

105.     Instead of accepting Plaintiff's request to meet and attempt to resolve the issues, on October 6, 2023, Dr. Plummer emailed Plaintiff to again inform him that he is not on track to pass his final course.  Dr. Plummer offered Plaintiff three options moving forward in the PT Program:

(1) The program would assign an incomplete grade for PT 843N.  Plaintiff would have to take an 11-week National Physical Therapy Examination (NPTE) course, complete an Academic Practice Exam and Assessment Tool (PEAT), and extend PT 843N for up to eight weeks;

(2) An IHP faculty member would assign a final grade for PT 843N.  If it was a failing grade, Plaintiff would face dismissal from the PT Program once again;

(3) Plaintiff could "voluntarily" withdraw from the PT Program and graduate with a Master of Health Studies degree, instead of a Doctorate of Physical Therapy.

106.     Plaintiff had significant concerns with each of the three options presented.  The first option would extend his time spent trying to earn his PT degree for another 19 weeks – or almost five months.  The rest of Plaintiff's classmates graduated in May 2022 and Plaintiff's course of study had already been extended some 15 months at this point.  The second option meant that an IHP faculty member would be grading Plaintiff's performance, which Plaintiff could not agree to without limited assurances that the IHP faculty members who have proven to improperly grade Plaintiff based on their biases against him would not be designated.  The third option meant Plaintiff would have wasted the last four years trying to earn his PT degree and would be forced to accept a Masters even though he was just one course grade short of his Doctorate.

107.    Ultimately, given his dedication to earning his degree and practicing physical therapy, Plaintiff asked Dr. Plummer for more information on the first option on October 17, 2023.

108.    Dr. Plummer responded on October 24, 2023 by offering Plaintiff one more option moving forward: Option 1B.  With this option, the program would assign an incomplete for PT 843N,  Plaintiff would have to take the 11-week NPTE course and the PEAT,  and then pass one more practical examination (instead of the eight week clinical rotation extension).

109.    Plaintiff responded to Dr. Plummer on October 27, 2023 expressing his ongoing concern that the PT program is insisting Plaintiff continue to prolong the time it takes for him to get his degree.  Instead of discussing other options, Plaintiff again asked to meet with Dr. Plummer and Dr. Chan to sort out the discrepancies between Dr. Chan's positive verbal feedback and IHP's impression that Plaintiff was not on track to pass his final class.  Plaintiff agreed to take the NPTE course, but asked if he could forgo both the extension of PT 843 at his clinical site or taking another practical exam.

110.    Dr. Plummer rejected Plaintiff's proposal, and again ignored his request for a meeting.

111.    Mr. Levitt – Plaintiff's attorney – emailed Melissa Brennan (IHP's attorney) in an effort to reach an agreement on Plaintiff's path moving forward.  On November 29, 2023,  Levitt wrote to Brennan that Plaintiff is "concerned that this situation is a form of retaliation, reminiscent of challenges he faced previously at the school."  Levitt proposed that if IHP is going to make Plaintiff take another practical examination, then the practical examination should at least test orthopedic cases that are similar to the ones Plaintiff encountered during his time at Concentra Medical Center, that Plaintiff should only be required to collaborate with instructors from the NPTE course, and that the exam be videotaped.

112.    Brennan responded with IHP's answers to Plaintiff's requests on December 13, 2023.  She agreed that the practical exam cases will have similar diagnoses to those Plaintiff encountered at Concentra and that the practical will take place via Zoom and be recorded.  She rejected Plaintiff's request about instructors, and said the practical will be graded by an IHP faculty member and Plaintiff will have to work with Dr. Arrigo and his new Academic Advisor, Dr. David Selkowitz.  Brennan ensured that both of these advisors would be able to answer Plaintiff's questions during the NPTE course and while preparing for the practical examination.  Plaintiff has heard this same promise before with respect to Dr. Naidoo, which proved to be false.

113.    Levitt tried one more time to persuade Brennan with an email sent on December 13, 2023.  Levitt wrote that Plaintiff should not be required to take "supplementary practical assessments beyond those initially delineated in the original study plan," and highlighted that Plaintiff has "experienced a loss of confidence in the guidance and mentorship provided by MGH IHP faculty."

114.    On January 4, 2024, Brennan responded that the practical exam is necessary to demonstrate that Plaintiff has met the degree requirements and is ready for clinical practice.  She also said that communication with IHP faculty is "not negotiable."

115.    The course of action that IHP was demanding of Plaintiff was once again outside of the normal course of conduct for other PT students.  The course description on IHP's website for PT 843N reads: "This is the first portion of the culminating clinical experience, extending for 14 weeks, focusing on the development of entry-level competence."[13]  Plaintiff's 14th week at Concentra ended on September 29, 2023, when Dr. Chan provided Plaintiff with inconsistent and inaccurate feedback on his CPI.  Plaintiff's competence as a physical therapist was described as

---

[13] *PT-843N Clinical Internship*, MGH Institute of Health Professions, https://mghihp.smartcatalogiq.com/en/2021-2022/catalog/course-descriptions/pt-physical-therapy/800/pt-843n/ (last visited Mar. 12, 2024).

"entry-level" as soon as December 2021, when his previous CI Dr. Krey wrote that on his CPI. Nowhere in the online course description, nor in the course syllabus, is there any mention of extending the internship or having to take a practical examination to pass the course.

116.    Despite IHP's continued differential treatment of Plaintiff, he responded to Brennan on January 19, 2024 and said that he would move forward with Option 1B but that he "reserve[d] the right to opt out at any time and initiate an investigation by a third party.  Thus far, the program has deviated from its own protocols without providing a satisfactory explanation, which suggests an element of antisemitism.  This departure from the expected standard not only contradicts the terms I agreed to as a student but also violates the fundamental principles of fair treatment."

117.    At this point, Plaintiff had again turned to outside counsel for advice on how to move forward with the school.  Plaintiff ceased communicating with the school based on the advice of his counsel and while he waited for his counsel to attempt to resolve the dispute with IHP.

118.    On April 17, 2024, IHP sent Plaintiff a letter revoking its proposed Option 1B and effectively dismissing Plaintiff from the PT Program with only the option of graduating with a Masters instead of a Doctorate degree.  Dr. Plummer gave Plaintiff until April 26, 2024 to respond before he would be "administratively withdrawn" from the school altogether.

**G.  IHP Repeatedly Violated Its Own Anti-Harassment Policies And APTA Guidelines**

119.    IHP's Annual Notice to Students says that the Institute prohibits discrimination in the administration of its programs and activities and that it "incorporates, by reference, the

requirements of Title VI of the Civil Rights Act, Title IX of the 1972 Educational Amendments, and all relevant federal, state, and local laws, statutes, and regulations."[14]

120.    IHP's Harassment Policy says that harassment on the basis of religion is not acceptable and will not be tolerated.  The Institute defines harassment as:

> "[T]he use of derogatory comments or act(s) directed toward an individual's … religion, national and ethnic origin … that: 1. Humiliates and/or intimidates an individual; 2. Has the purpose or effect of creating a hostile or offensive learning, living, or working environment; 3. Impedes and/or interferes with learning or living environment, work performance, or campus life activities."[15]

121.    IHP's Harassment Policy also has a section on retaliation, which states:

> "A retaliatory action or behavior taken toward an individual as a consequence of his or her decision to report a complaint … is prohibited. Retaliatory acts may include intimidation, threats, harassment, and/or other adverse action threatened or taken against a complainant or third party. Such retaliation shall be considered a serious violation of this Policy and shall be independent of whether a charge of harassment is substantiated."[16]

122.    IHP violated each of these policies.

123.    Dr. Karim acted derogatory when she saw Plaintiff's Star of David necklace, a symbol of his Jewish faith, and aggressively responded that she was Lebanese-Palestinian and looked at him with hatred and disgust.  Mr. Clock, Dr. Applebaum, and Mr. Boutin made derogatory comments directed at Plaintiff's Jewish religion and Middle Eastern origins when they questioned how he would treat patients that were Palestinian or women.

---

[14] *Annual Notice to Students*, MGH Institute of Health Professions, https://mghihp.smartcatalogiq.com/en/2021-2022/catalog/annual-notice-to-students/ (last visited Mar. 14, 2024).

[15] *Harassment Policy*, MGH Institute of Health Professions, https://www.smartcatalogiq.com/en/catalogs/mgh-institute-of-health-professions/2019-2020/student-handbook/section-ii-institute-policies/title-ix-sexual-harassment-assault-and-non-discrimination-policies/harassment-policy (last visited Mar. 14, 2024).

[16] *Id.*

124. Plaintiff reported each of these incidents to CAPP, the Student Grievance Hearing Panel, and the Senior Legal Counsel at the Mass General Brigham Office. He also tried to report these incidents to an ombudsman, but IHP did not have one at the time of his request. The school subsequently hired an ombudsman, recognizing that deficiency in available student resources. The ombudsman was never put in contact with Plaintiff, despite his earlier request to speak to one.

125. IHP never acknowledged the treatment that Plaintiff has faced at the hands of these faculty members. Instead, the Institute took adverse action against Plaintiff by not allowing him to continue his studies for almost a full year after he was reinstated into the PT Program. IHP continues to take adverse action against Plaintiff by conditioning his well-earned PT degree on either extending his time at his last completed clinical internship at Concentra or taking yet another practical examination. Neither of these conditions appear as options in the PT 843N course description or course syllabus. IHP is now attempting to oust Plaintiff from the school with a lesser-earned degree.

126. While IHP has yet to acknowledge its discrimination of Plaintiff, the Institute has already admitted to violating its own policies and procedures. The Student Grievance Hearing Panel found an "inequitable application of the Institute's existing rules" when applied to Plaintiff's case in its June 23, 2022 decision. Some of the rules that were inequitably applied to Plaintiff include:

   a. The rest of Plaintiff's classmates having been provided with "extensive resources" by IHP to help them succeed on the CCPE and were allowed to study with their peers. One of Plaintiff's classmates said that studying with others was "an absolute requisite to pass the comprehensive practical," yet Plaintiff "wasn't allowed outside

help when it came to preparations for finals. Which wasn't the case when I or my other classmates prepped for our finals."

b. Plaintiff's classmates encountering "unknown individuals" who acted as the mock patients during their CCPE, while Plaintiff had an IHP faculty member acting as both proctor and participant without disclosing such roles to Plaintiff. As one of Plaintiff's classmates said, "having to conduct a practical examination with a professor in the room would only intensify an already stressful experience," so "the rest of the cohort encountered unknown individuals" for that portion.

c. Plaintiff's classmates who were unsuccessful on the CCPE were allowed to retake it within three days, but Plaintiff had to wait eight.

d. When other students get dismissed from IHP, their ID Cards remain activate until their dismissal is final, and their Mass General Brigham logon and D2L remain active for seven days after the dismissal is final.[17] Plaintiff was denied such access before he even had the chance to appeal his decision.

127. IHP also repeatedly violated guidelines promulgated by the APTA, including by: (1) permitting Dr. Driscoll to evaluate Plaintiff's potential rather than his actual performance in April 2021; (2) permitting Dr. Chan to evaluate Plaintiff based on inconsistent feedback and fabricated occurrences; (3) instructing Plaintiff's clinical instructors to "be tough" on him; and (4) threatening Plaintiff's dismissal if he will not agree to extend his studies at IHP via the inequitable options sent to him in October 2023. The due process section of the APTA manual explains that due process "is an aspect of the 14th amendment that requires a course of formal proceedings to be completed in accordance with established rules and regulations. The minimum requirement for

---

[17] *Systems Actions Post-Dismissal*, MGH Institute of Health Professions, https://mghihp.smartcatalogiq.com/2021-2022/catalog/academic-policies/dismissal-policy/systems-actions-post-dismissal/ (last visited Mar. 12, 2024).

due process is to provide the student an opportunity to 1. Respond to the charges. 2. Explain their conduct. 3. Provide proper context." IHP would not even give Plaintiff a meeting with all parties involved, despite his repeated requests.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964,
### 42 U.S.C. § 2000d *et seq.*
### (Intentional Discrimination and Hostile Environment Towards Jewish Students)

128.    Plaintiff repeats all the allegations set forth in the paragraphs above.

129.    Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d reads:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

130.    IHP receives Federal financial assistance from the United States Department of Education and is therefore subject to Title VI of the Civil Rights Act of 1964. IHP's PT Program is also a program or activity subject to Title VI regulation.

131.    Title VI, as interpreted by the courts and by the Office of Civil Rights of the U.S. Department of Education, prohibits discrimination based on religion if it is part of one's shared ancestry or ethnicity, including discrimination against people of the Jewish faith, such as Plaintiff.

132.    Title VI, as interpreted by the courts and by the United States Department of Education's Office for Civil Rights, requires schools receiving Federal financial assistance to address discrimination against Jewish students when:

> [T]he discrimination involves racial, ethnic, or ancestral slurs or stereotypes; when the discrimination is based on a student's skin color, physical features, or style of dress that reflects both ethnic

DocuSign Envelope ID: 1C60D341-2E76-4F9A-9101-5735DA3CB20F

and religious traditions; and when the discrimination is based on
where a student came from or is perceived to have come from.

133.    Title VI prohibits IHP from discriminating against Plaintiff on the basis of his

Jewish shared ancestry or ethnicity and his Israeli national origin.

134.    IHP's conduct, as alleged above, denied Plaintiff the benefits of, and subjected

Plaintiff to discrimination under, the PT Program at IHP.

135.    Plaintiff was treated different from his similarly situated non-Jewish, non-Israeli,

non-Middle Eastern classmates.  There was no legitimate, non-discriminatory reason for these

adverse actions.

136.    IHP also failed to address instances of discrimination against Plaintiff by IHP

faculty and staff, despite having knowledge of such discrimination.

137.    IHP's conduct, as alleged above, constitutes a violation of VI.

138.    The acts and omissions of IHP and its faculty subjected, and continue to subject,

Plaintiff to discrimination and harassment on the bases of his actual and/or perceived Jewish

shared ancestry, ethnic characteristics, and national origin.

139.    IHP had actual notice that such discrimination and harassment, over which it has

substantial control and the authority to remediate, was and continues to be so severe, pervasive,

and objectively offensive that it created and continues to create a hostile environment based on

Jewish ancestry, race, ethnic characteristics, or national origin that deprived Plaintiff of full

access to IHP's educational programs, activities, and opportunities.

140.    Specifically, Plaintiff was subject to discrimination involving ethnic and ancestral

stereotypes when, *inter alia*: (1) IHP faculty members questioned his ability to equitably treat

physical therapy patients who are women or of Palestinian origin; (2) Plaintiff was publicly

humiliated for wearing his Star of David necklace to class; (3) Plaintiff was told to be aware of

his presence as a Middle Eastern man in the workplace; (4) Plaintiff was improperly graded based on prejudice; (5) Plaintiff received different and unequal treatment from his peers in conjunction with the CCPE and his academic path since.

141.   Plaintiff properly reported each of these instances of discrimination to IHP, which failed to adequately address a single one of his reports and failed to prevent further discrimination.  IHP thus knew about the discrimination Plaintiff faced and failed to take any prompt or effective steps to end it.

142.   IHP's violations of Title VI are the actual, direct, and proximate causes of Plaintiff's injuries.

143.   As a result of IHP's violation of Title VI, Plaintiff's time spent trying to obtain his PT degree has been extended for two years longer than the rest of his classmates.  IHP's actions have cost Plaintiff two extra years of interest on his student loans, additional housing and utility costs, and lost wages that his fellow classmates have been earning as licensed physical therapists.  Plaintiff has also incurred legal fees, tutoring fees, early moving costs, termination of his housing contract, and extra course fees due to the actions of IHP.  Plaintiff has suffered damages and continues to suffer substantial damages from IHP's breach in monetary amounts to be determined at trial.

144.   Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**COUNT II**
**VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964,**
**42 U.S.C. § 2000d *et seq.*
(Retaliation)**

145.   Plaintiff repeats all the allegations set forth in the paragraphs above.

146.   Title VI, as interpreted by the courts and by the United States Department of Justice Civil Rights Division, supports retaliation claims.  When someone reasonably believes

that they have been the subject of discrimination under Title VI and reports such discrimination, they are protected from significantly adverse actions taken against them in response to their reporting.

147. As alleged above, Plaintiff reasonably believed that various members of IHP's faculty discriminated against him on the bases of his actual and/or perceived Jewish ancestry, race, ethnic characteristics, or national origin.

148. Plaintiff repeatedly reported instances of such discrimination, including to Mr. Clock, CAPP, the Student Grievance Hearing Panel, and the Senior Legal Counsel of Mass General Brigham through the MCAD and the Brandeis Center. Plaintiff also attempted to report such discrimination through an ombudsman, but this request was denied.

149. In response to Plaintiff's reports, IHP took significantly adverse action against Plaintiff by prolonging his return to his courses following his improper dismissal from the PT Program, inventing new course requirements that only he would be required to fulfill, and attempting to oust him from the school altogether with a only a Masters instead of his well-earned Doctorate degree.

150. To this day, IHP has yet to adequately address a single one of Plaintiff's reports of systematic and targeted discrimination by IHP faculty.

151. As a result of IHP's violation of Title VI, Plaintiff's time spent trying to obtain his PT degree has been extended for two years longer than the rest of his classmates. IHP's actions have cost Plaintiff two extra years of interest on his student loans, additional housing and utility costs, and lost wages that his fellow classmates have been earning as licensed physical therapists. Plaintiff has also incurred legal fees, tutoring fees, early moving costs, termination of his housing contract, and extra course fees due to the actions of IHP. Plaintiff has suffered damages and

continues to suffer substantial damages from IHP's breach in monetary amounts to be determined at trial.

## COUNT III
## BREACH OF CONTRACT

152.    Plaintiff repeats all the allegations set forth in the paragraphs above.

153.    A valid and binding contractual agreement exists between educational institutions and students.  A promise, offer, or commitment from student handbooks and university policy manuals can form the basis of a valid contract.  A breach of contract is established when an educational institution fails to meet a student's reasonable expectations from those handbooks and policy manuals.

154.    At all relevant times, an express contractual relationship existed between IHP and Plaintiff, by virtue of his enrollment at IHP as defined by and through IHP's written codes, policies, and procedures.  IHP publically posts a yearly catalogue that outlines the Institute's policies and procedures.  The program requirements contained in this yearly catalogue "must be satisfied by the student for successful completion."  Thus, when a student enrolls in an IHP program and pays tuition, that student enters into a contractually binding agreement with IHP to follow the school's policies and procedures in order to earn their degree.

155.    One of the first pages of IHP's yearly catalogue contains an Annual Notice to Students, informing all students that the Institute prohibits discrimination in the administration of its programs and activities, and that school policy incorporates by reference Title VI of the Civil Rights Act.  The Annual Notice is attached hereto as **Exhibit 2.**

156.    IHP also circulates a yearly student handbook, which contains a number of specific policy statements and procedures that form the basis of a valid contract between the Institute and the student.  The student handbook repeats the Institute's promise to prohibit

DocuSign Envelope ID: 1C60D341-2E76-4F9A-9101-5735DA3CB20F

discrimination in the administration of its programs and activities, incorporating Title VI by reference. The student handbook is attached hereto as **Exhibit 3.**

157.    IHP's Harassment Policy can be found in the yearly student handbook, which promises to protect students from harassment on the basis of their religion, national, and ethnic origin.

158.    Under this contract, Plaintiff agreed to and did pay IHP tuition. Conversely, IHP agreed, among other things, to provide Plaintiff with a discrimination free environment to be achieved by abiding by, and adequately enforcing IHP's policies.

159.    Plaintiff complied and continues to comply with his obligations under this contract.

160.    IHP breached its contract with Plaintiff by failing to prevent – and even permitting and endorsing – discriminatory and harassing conduct that Plaintiff was subjected to. This included, but is not limited to: (1) multiple faculty members making derogatory comments to Plaintiff about his Jewish religion and Middle Eastern origins; (2) humiliating Plaintiff to the point where he stopped wearing his Star of David necklace to class; (3) creating such a hostile learning environment that Plaintiff no longer felt safe on IHP's campus; (4) ousting Plaintiff from the PT program and denying him the full opportunity to benefit from learning at IHP; (5) violating its own anti-harassment policies and procedures. IHP failed meet Plaintiff's reasonable expectation of the education benefits to which he is entitled.

161.    Plaintiff also reasonably expected from IHP's Harassment Policy that he would be protected from retaliation if he were to report a complaint. IHP breached this agreement with Plaintiff by delaying his return to his studies and creating new requirements for him to receive his PT degree.

162.    As a result of IHP's breach, Plaintiff's time spent trying to obtain his PT degree has been extended for two years longer than the rest of his classmates.  IHP's actions have cost Plaintiff two extra years of interest on his student loans, additional housing and utility costs, and lost wages that his fellow classmates have been earning as licensed physical therapists.  Plaintiff has also incurred legal fees, tutoring fees, early moving costs, termination of his housing contract, and extra course fees due to the actions of IHP.  Plaintiff has suffered damages and continues to suffer substantial damages from IHP's breach in monetary amounts to be determined at trial.

**COUNT IV**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

163.    Plaintiff repeats all the allegations set forth in the paragraphs above.

164.    IHP breached the implied covenant of good faith and fair dealing implied in its contract with Plaintiff.  IHP breached the implied covenant of good faith and fair dealing by failing to prevent – and even permitting and endorsing – the discriminatory and harassing conduct that Plaintiff was subjected to.  This included, but is not limited to: (1) multiple faculty members making derogatory comments to Plaintiff about his Jewish religion and Middle Eastern origins; (2) humiliating Plaintiff to the point where he stopped wearing his Star of David necklace to class; (3) creating such a hostile learning environment that Plaintiff no longer felt safe on IHP's campus; (4) ousting Plaintiff from the PT program and denying him the full opportunity to benefit from learning at IHP; (5) violating its own anti-harassment policies and procedures.  IHP failed meet Plaintiff's reasonable expectation of the education benefits to which he is entitled.

165.    Plaintiff also reasonably expected from IHP's Harassment Policy that he would be protected from retaliation if he were to report a complaint.  IHP breached the implied covenant

of good faith and fair dealing delaying Plaintiff's return to his studies and creating new requirements for him to receive his PT degree.

166.     As a result of IHP's breach, Plaintiff's time spent trying to obtain his PT degree has been extended for two years longer than the rest of his classmates.  IHP's actions have cost Plaintiff two extra years of interest on his student loans, additional housing and utility costs, and lost wages that his fellow classmates have been earning as licensed physical therapists.  Plaintiff has also incurred legal fees, tutoring fees, early moving costs, termination of his housing contract, and extra course fees due to the actions of IHP.  Plaintiff has suffered damages and continues to suffer substantial damages from IHP's breach in monetary amounts to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays and demands that a judgment be entered in his favor, and that the Court grant the following relief:

a.     Preliminary and Permanent Injunctive relief preventing and enjoining IHP from violating Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, including but not limited to, preventing and enjoining IHP from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that penalize or discriminate against Jewish students, including Plaintiff, in any way, and ordering Defendant to take all necessary, adequate, and appropriate remedial, corrective, and preventative measures including by, among other things: (i) disciplinary measures, including the termination of, deans, administrators, professors, clinical advisors, academic advisors and other employees responsible for anti-Semitic discrimination and abuse, whether because they engage in it or permit it; (ii) disciplinary measures, including suspension or expulsion, against students who engage in such

conduct; (iii) reforming and/or eliminating Diversity, Equity, and Inclusion protocols that encourage and/or foster anti-Semitism; (iv) refusing to partner with clinical sites or clinical instructors who engage in or permit anti-Semitic discrimination and abuse, and; (v) adding mandatory training with respect to traditional and contemporary manifestations of anti-Semitism, including national origin-based discrimination on the basis of shared ancestry and ethnicity for the IHP community members;

      b.      Damages, including but not limited to, compensatory, consequential, and punitive damages in amounts to be determined at trial;

      c.      Reasonable attorney's fees and costs;

      d.      Pre-judgment and post-judgment interest as provided by law; and

      e.      Such other relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

May 14, 2024

Respectfully submitted,

By: _____
David Abrams (MASS BBO # 639250)
PO Box 3353 Church Street Station
New York, NY 10008
Tel. 212-897-5821
Fax 212-897-5811
dnabrams@wjlf.org

*Attorney for Plaintiff John Doe*

DocuSign Envelope ID: 1C60D341-2E76-4F9A-9101-5735DA3CB20F

## **VERIFICATION**

I, John Doe, have read the foregoing Complaint and know its contents.  I am informed and believe and on that ground allege that the matters stated in the aforementioned document are true and correct.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on __May 14, 2024__ at Beverly Hills, California.



John Doe